**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANIKA DASHIELDS,** *Administrator of the Estate of Taylor Granston, Deceased,*<br>*Plaintiff,*<br>*v.*<br>**AMERICAN NATIONAL RED CROSS and MARK RENNA,**<br>*Defendants.*<br>**AMERICAN NATIONAL RED CROSS**<br>*Third Party Plaintiff*<br>*v.*<br>**PHOEBE CHACALIAZA and TYSEAN GILBERT.**<br>*Third Party Defendants* | **CIVIL ACTION**<br><br>**NO. 25-6169-KSM** |

# MEMORANDUM

**Marston, J.** **November 13, 2026**

This case stems from a horrific car accident involving six cars and twelve individuals on the night of December 12, 2024, along the I-95 Delaware Expressway in Philadelphia. (Doc. No. 1-4.) As a result of this accident, Taylor Granston (the "Decedent") suffered severe life-threatening injuries, and she tragically died twelve days later. (*Id.* at 7.) Anika Dashields, Administrator of Decedent's Estate ("Plaintiff") brought claims for negligence and wrongful death, as well as claims pursuant to Pennsylvania's Survival Act, against the American National Red Cross ("Red Cross") and Mark Renna—the owners of two vehicles involved in the accident. (*Id.* at 6–12.) After conducting some portion of discovery, the parties settled their suit. (Doc. No. 74.)

Because this agreement settles a claim on behalf of an estate and purports to settle both the wrongful death claim and survival action for a single amount, Pennsylvania law and this

Court's Local Rules require court approval before the settlement becomes effective. *See* 20 Pa. Cons. Stat. § 3323 (requiring court approval by either the Pennsylvania Orphans Court or the court in which the action is pending of any settlement of claims by or against an estate); *Moore v. Gates*, 580 A.2d 1138, 1141 (Pa. Super. Ct. 1990) (outlining that "[b]efore a survival claim can be settled on behalf of a decedent's estate" and or before wrongful death and survival actions can be "settled for a single amount," the settlement "must be judicially approved"); *see also* L. Civ. R. 41.2(a) ("No claim of a minor or incapacitated person or of a decedent's estate in which a minor or incapacitated person has an interest shall be compromised, settled, or dismissed unless approved by the court."). Accordingly, before the Court is Plaintiff's Petition for Approval to Compromise Wrongful Death & Survival Action. (Doc. No. 76.) For the reasons set forth in this Memorandum, the Court grants Plaintiff's petition and approves the settlement in its entirety.

## I. Factual Background

According to Plaintiff's Complaint ("the Complaint"), on or about December 12, 2024, a motor vehicle accident occurred on the I-95 Expressway in Philadelphia, Pennsylvania involving multiple collisions. (Doc. No. 1-4.) According to the Pennsylvania State Police Crash Report, the accident involved a total of six motor vehicles. (Doc. No. 16 at 4.)

The Crash Report explains that at approximately 10:30 p.m. on the night of the accident, "a traffic Unit became mechanically disabled and came to an abrupt stop blocking the left lane of travel" along the Expressway, causing vehicles behind it to quickly come to a stop. (Doc. No. 16-2 at 22.) In response to the sudden onset of traffic, the first vehicle relevant here, driven by Defendant Renna ("the Renna Vehicle"), "swerved to the left to avoid a rear-ended collision with" an uninvolved vehicle. (*Id.*) However, the Renna Vehicle was unable to avoid a rear-end

collision with a second vehicle, owned and operated by Phoebe Chacaliaza ("the Chacaliaza Vehicle"). (*Id.*) As a result, "the collision propelled [the Chacaliaza Vehicle] into the rear-end" of a third vehicle ("the Granston Vehicle"), owned by Plaintiff and operated by Tysean Gilbert. (*Id.*) The Granston Vehicle contained four passengers at the time of the collision: driver Tysean Gilbert, Decedent Taylor Granston, and two uninjured minor children in the backseat. (*Id.*)

The Chacaliaza Vehicle "propelled [the Granston Vehicle] forward into the center-left and center lanes" of traffic into the path of a fourth vehicle, owned by the Red Cross ("the Red Cross Vehicle"). (*Id.*) The Red Cross Vehicle "hit the front passenger side of [the Granston Vehicle], causing [it] to spin 180 degrees" and eventually hit an additional car, owned and operated by Sebastian Buitrago-Quijano ("the Buitrago-Quijano Vehicle"). (*Id.*) Simultaneously, but separately, a sixth vehicle, owned and operated by Sa Win ("the Win Vehicle") "applied his brakes but was unable to stop in time," colliding with the rear-end of the Renna Vehicle after it had already struck the Chacaliaza Vehicle. (*Id.*) According to the Crash Report, Renna and Win were "driving too fast for conditions" in a fifty-five mile per hour zone with ambient lighting. (Doc. No. 16-2 at 2, 6 (capitalization omitted).)

The Crash Report states that the Renna Vehicle's collision with the Chacaliaza Vehicle was the "first harmful event in the crash." (*Id.* at 1.) But the Crash Report identified the Red Cross Vehicle's collision with the front passenger side of the Granston vehicle as the "most harmful event in the crash." (*Id.* at 1.) As a result of being struck by the Red Cross Vehicle, the Decedent "suffered severe, permanent, and disabling personal injuries . . . of her body," resulting in twelve days of invasive mechanical ventilation, and then, ultimately, her death on December 24, 2024. (Doc. No. 1-4 at 15.)

Plaintiff, Administrator of Decedent's Estate, brought claims for negligence (Counts I and II) and wrongful death (Count III), as well as claims pursuant to the Survival Act (Count IV) against Red Cross and Renna. (*Id.* at 6–12.) Defendant Red Cross filed an Answer and asserted third party claims for negligence against Third-Party Defendants Phoebe Chacaliaza, Tysean Gilbert, Sa Win, Anika Dashields, and Sebastian Buitrago-Quijano (Counts I–IV) and for negligent entrustment against only Anika Dashields (Count V). (*See* Doc. No. 16.) The Court granted Win and Buitagro-Quijano's motions to dismiss the Third-Party Complaints against them (*see* Doc. No. 44) and the parties later agreed to dismiss Anika Dashields as a Third-Party Defendant (s*ee* Doc. No. 53).

After conducting some portion of discovery, and following two settlement conferences with Magistrate Judge Carol Sandra Moore Wells, the parties settled their suit. (Doc. Nos. 57, 71, and 74.) On September 23, 2026, Plaintiff filed an unopposed Petition for Approval to Compromise Wrongful Death and Survival Action (Doc. No. 76.)

## II. Legal Analysis

Section 3323 of Pennsylvania's Probate, Estates, and Fiduciaries Code requires court approval of any settlement involving claims brought on behalf of or against an estate. *See* 20 Pa. Cons. Stat. § 3323(a). This includes survival actions. *See Moore*, 580 A.2d at 1141 ("Before a survival claim can be settled on behalf of a decedent's estate, . . . such a settlement must be judicially approved."); *Schuster v. Reeves*, 589 A.2d 731, 734 (Pa. Super. Ct. 1991) ("The survival action . . . was a claim on behalf of the decedent estate, and it could not be settled without court approval. Without such approval the attempt to settle and release the estate's claims was ineffective."). Relatedly, "where wrongful death and survival actions are settled for a single amount, the amount apportioned to the survival action must be approved by a court having

jurisdiction." *Moore*, 580 A.2d at 1141. As the Court in which this action was pending, we have such jurisdiction under § 3323(b). 20 Pa. Cons. Stat. § 3323(b)(1) ("Whenever it is desired to compromise or settle an action in which damages are sought to be recovered on behalf of an estate, any court or division thereof in which such action is pending and which has jurisdiction thereof may . . . make an order approving such compromise or settlement."); *Moore*, 580 A.2d at 1141 ("Where a survival action is pending, . . . a settlement thereof may be approved by the court in which it is pending . . . .").

The requirement of court approval "is intended to protect the estate, as well as the creditors and beneficiaries thereof." *Moore*, 580 A.2d at 1141; *see also Soares v. McClosky*, 466 F. Supp. 703, 707 (E.D. Pa. 1979) (explaining that § 3323 "serves several substantive ends: it protects potential beneficiaries, assures that the taxing authority gets its due, and shelters the decedent's representative from subsequent liability by eliciting a judicial determination whether a proposed settlement (or other termination) sufficiently protects the decedent's estate"). It follows that "a court may refuse to approve a settlement of a survival action which is inadequate." *Moore*, 580 A.2d at 1141.

In approving the proposed settlement of a survival action, the Court may also "approve an agreement for the payment of counsel fees and other proper expenses incident to such action." 20 Pa. Cons. Stat. § 3323(b)(1). Therefore, approval of Plaintiff's petition requires determinations as to: 1) the adequacy of the proposed settlement amount; 2) the reasonableness of the proposed apportionment of the settlement amount between the wrongful death and survival action claims; 3) the reasonableness of the attorneys' fees and costs requested; and 4) the reasonableness of the remaining distribution. The Court addresses each in turn.

### A. Adequacy of the Settlement Amount

The Court turns first to whether the proposed settlement amount is adequate. Section 3323 "contemplates a judicial inquiry into the propriety of a proposed compromise or settlement by the estate, whether or not it is contested, consistent with the court's supervisory jurisdiction over decedents' estates, and an adjudication based thereon." *Krause v. B&O R.R.*, 33 Pa. D. & C.3d 458, 466 (Pa. Ct. Comm. Pl. 1983); *Tamasy v. Yough Sch. Dist.*, No. 18cv01236, 2019 WL 5864893, at *1 (W.D. Pa. Nov. 8, 2019). In performing this inquiry, the court must "exercise independent judgment on the whole case," and decide whether the proposed settlement is "fair and reasonable under the circumstances." *Krause*, 33 Pa. D. & C.3d at 467 (quotation marks omitted). Because "[t]he court must independently evaluate the proposed settlement petition," the petition must "provide the court with sufficient information on which to base its determination," including "all relevant facts and the reasons why the administrator of the . . . estate believes the settlement is desirable and why it is in the estate's best interest to settle the action." *Rodi v. Williams*, No. 12cv1379, 2015 WL 1863006, at *2 (M.D. Pa. Apr. 23, 2015) (cleaned up).

Under the terms of the proposed settlement, Plaintiff will receive a lump sum to be allocated on a 65%–35% basis with their counsel.[1] (Doc. No. 76.) After payment of attorneys' fees and costs and a healthcare lien, Plaintiff proposes apportioning the remaining balance on a

---

[1] The Court will not disclose the exact terms of the settlement here, as the settlement amount in the Petition was filed under seal and the parties have agreed that the amount of the settlement is confidential. (*See* Doc. No. 75.) At this point, the Court finds that it is appropriate to maintain the confidentiality of the settlement agreement. Disclosure of the terms of the settlement could "work a clearly defined and serious injury" as to Defendants, including by hampering their ability to litigate and/or negotiate the resolution of future actions. *Genentech, Inc. v. Amgen, Inc.*, No. 17cv1407, 2020 WL 9432700, at *6 (D. Del. Sept. 2, 2020) (granting motion to seal where "[r]evelation of the terms of settlement agreements . . . could place the parties at a demonstrable disadvantage in navigating and negotiating other litigation contests"). However, the Court reserves the authority to unseal the settlement terms should it become necessary in the future to protect the public's right of access.

67.67%–33.33% basis between the wrongful death and survival claims. (*Id.*) Plaintiff then proposes to evenly split the wrongful death apportionment between Decedent's parents. (*Id.*)

In determining whether this amount is adequate, the Court gives "'considerable weight' to the consensus of parties represented by counsel because the lawyers and parties are closer to the case and have a better handle on the risks and upsides of the litigation." *Carter v. Wellpath LLC*, No. 22cv01050, 2023 WL 6323095, at *1 (E.D. Pa. Sept. 28, 2023) (quoting *In re McLean Contracting*, No. 14cv5676, 2017 WL 2618855, at *1 (E.D. Pa. June 16, 2017)). This consideration is particularly weighty here where the parties' settlement negotiations were aided by the Honorable Carol Sandra Moore Wells, Magistrate Judge, who has extensive experience assisting parties reach mutually beneficial settlement agreements. *See Carter*, 2023 WL 6323095, at *1 (finding significant that the parties participated in good faith negotiations in front of a magistrate judge); *Leto v. Illum*, No. 20cv884, 2021 WL 2186238, at *3 (E.D. Pa. May 28, 2021) (same). Plaintiff's counsel and Plaintiff aver that the proposed settlement is "reasonable" in light of the surrounding circumstances. (*See* Doc. No. 76 at 4 (outlining Plaintiff's counsel's view that the proposed settlement is "reasonable under the circumstances"); *see also id.* at 12 (verifying that Plaintiff "approve[s] the proposed settlement").)

In determining whether the proposed amount is adequate, courts also must analyze the strengths and weaknesses of the particular case, including whether the plaintiff faces any "issues of proof that could hamstring their efforts to establish liability." *Tamasy*, 2019 WL 5864893, at *2. The Court's independent review of the facts suggests that there is no reason to second guess the parties' judgment here. While the Court does not have the benefit of the discovery that took place after the Complaint was filed, Plaintiff has raised substantial questions about whether Defendants Red Cross and Rena were operating their respective vehicles negligently. But

Plaintiff's claims, while strong, also face potentially significant hurdles related to causation and joint or several liability between the Defendants and Third-Party Defendants. (*See* Doc. No. 14-2 at 7.)

In addition to considering the case's potential strengths and weaknesses, we also consider the costs, economic and emotional, of fully litigating this case. *See Romano v. United States*, No. 20cv1852, 2020 WL 7364453, at *3 (E.D. Pa. Dec. 15, 2020) (providing that the Court must consider not only the strength and weaknesses of each side's case but also the costs associated with litigation). Plaintiff stated in the Joint Rule 26(f) Report that the parties intended to conduct ten fact depositions each. (*See* Doc. No. 9 at 3.) Along with whatever fact discovery remained, the parties also intended to retain experts for accident reconstruction, medicine, and damages. (*See id.* at 4.) The retention, preparation, and examination of these experts likely would have been an expensive process that would have eaten into any award Plaintiff received. (*See* Doc. No. 76 at 39 (outlining that Plaintiff was responsible for costs associated with "investigations, medical records, court costs, deposition fees, expert reports/testimony, etc." aside from attorneys' fees).)

Additional facts relevant to our inquiry include "how many medical bills and liens regarding the care of the deceased . . . are to be handled by the settlement." *Rodi*, 2015 WL 1863006, at *2 (cleaned up). Here, Machinify, on behalf of Aetna, asserted and seeks full recovery of a health insurance lien of $212,563.86 for Decedent's medical expenses. (Doc. No. 76 at 6, 24.)

Considering the parties' acquiescence to the settlement amount, the strengths and weaknesses of the parties' arguments, the risks and expenses associated with fully litigating this

matter, and the health insurance lien placed on the proceeds, the Court concludes that the settlement amount is adequate to settle Plaintiff's claims.

### B. Allocation of Proceeds

Having determined that the settlement amount is adequate, the Court now turns to the proposed allocation of the settlement funds between the survival action and wrongful death claim. Plaintiff proposes apportioning the settlement proceeds on a 67.67%–33.33% basis between the wrongful death and survival claims. (Doc. No. 76 at 4.) The Court finds this proposed allocation reasonable and fair.

"Pennsylvania cases do not explicitly address settlement allocation formulas," but "Pennsylvania law clearly delineates the requirements to satisfy a wrongful death and survival action award." *Smith v. Sandals Resort Int'l, Ltd.*, 709 F. Supp. 2d 350, 358 (E.D. Pa. Apr. 19, 2010) *aff'd*, 437 F. App'x 178 (3d Cir. 2011). "Survival actions under the Pennsylvania Survival Act, 42 Pa. C.S. § 8302, are brought by the administrator of the estate to benefit the decedent's estate." *Rodi*, 2015 WL 1863006, at *1. "Survival action damages compensate the decedent's estate for losses from the tort," and account for "decedent's pain and suffering, loss of gross earning power from the date of injury until death, and probable earning during his life expectancy minus the probable cost of maintaining himself and wrongful death damages." *Smith*, 709 F. Supp. 2d at 358. "Survival action proceeds are divided among the heirs of the decedent, either through the decedent's will or by the laws of intestate, regardless of pecuniary loss." *Id.*

By contrast, wrongful death "damages compensate the spouse, children, or parents of decedent for the pecuniary loss, i.e., contributions the decedent would have made for their shelter, food, clothing, medical care, education, entertainment, gifts, and recreation, they would

have received from him had the decedent lived." *Id.* at 356. "Pecuniary loss also includes the pecuniary value of the services, society, and comfort the relatives would have received from the decedent." *Id.* Because Pennsylvania policy "favors wrongful death beneficiaries over estate beneficiaries," courts have "approved settlements allocating large percentages to the wrongful death action over the survival action." *Id.* at 358. And "there is nothing inherently suspect or improper about a settlement allocation favoring wrongful death beneficiaries." *Tamasy*, 2019 WL 5864893, at *2–3 (finding allocation of settlement funds reasonable even though the parties allocated the entire amount to the wrongful death claim); *see also Rodi*, 2015 WL 1863006, at *3 (same).

Applying these principles, we find that Plaintiff's proposed apportionment is a reasonable allocation of the settlement funds. After payment of the healthcare lien and attorney's fees and costs, Plaintiff proposes apportioning 33.33% of the proceeds to the survival claim. The remaining 67.67% of the net proceeds would go to the wrongful death action and to the Decedent's parents as the sole wrongful death beneficiaries. Although the survival action is allotted a lesser percentage than that given to the wrongful death claim, the Court notes that this is a substantially larger allocation than that approved in *Tamasy* and *Rodi*, where none of the settlement proceeds were apportioned to the survival action. We also believe this smaller percentage is reasonable here because Decedent's projected earning power was approximately $1,000,000 and the Decedent's pain and suffering, while great, were brief. (*See* Doc. No. 76 at 4 ("Counsel is of the professional opinion that the proposed settlement is reasonable under the circumstances given Decedent's limited conscious pain and suffering and approximately $1,000,000.00 in future earnings based on Decedent's education and work history.").) Last, we note that the Pennsylvania Department of Revenue has stated that it has no objection to the

proposed allocation of the gross proceeds of the action. (Doc. No. 77.) *Cf. Hammonds v. Luzerne County*, No. 19cv2199, 2020 WL 5517496, at *1 (M.D. Pa. Sept. 14, 2020) (relying on Pennsylvania Department of Revenue's approval of the proposed allocation).

For those reasons, and in light of Pennsylvania's policy favoring wrongful death beneficiaries, the Court concludes that Plaintiff has proposed a reasonable allocation of the settlement proceeds between the survival and wrongful death claims.

### C. Attorneys' Fees

The Court turns next to the appropriateness of attorneys' fees and costs. The Court notes that "[w]hen addressing the reasonableness of attorney's fees, 'courts should be . . . reluctant to disturb contingent fee arrangements freely entered into by knowledgeable and competent parties.'" *Carter*, 2023 WL 6323095, at *2 (quoting *Ryan v. Butera, Beausang, Cohen & Brennan*, 193 F.3d 210, 215 (3d Cir. 1999)); *see also Leto*, 2021 WL 2186238, at *3; *cf. In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001) ("Courts should afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel."). After all, "Plaintiff's counsel took on risk in pursuing this case for which they should be rewarded." *Salas v. Goldenberg*, No. 22cv2179, 2023 WL 8832422, at *2 (E.D. Pa. Dec. 20, 2023) (cleaned up).

Here, counsel has advanced expenses totaling $71,001.24 and seek attorneys' fees equal to 35% of the gross settlement amount. (Doc. No. 76 at 6.) These fees and costs are requested pursuant to the fee agreement that Plaintiff and her counsel agreed to prior to the commencement of this lawsuit. (*Id.* at 39.)

The Court finds these costs and fees reasonable under the circumstances. First, Plaintiff agreed prior to the commencement of this lawsuit that she would be responsible for costs

separate from attorneys' fees, including "payment for investigations, medical records, court costs, deposition fees, expert reports/testimony, etc." (*Id.*) The Court's thorough review of Plaintiff's counsel's invoice reveals that these costs were appropriately accrued during counsel's representation over the span of 20 months and reflect counsel's extensive work on the matter. (*Id.*at 36–37.) The invoice reflects costs for private investigators, court reporters, forensic experts, and other typical litigation expenses for a case that was well into discovery. (*Id.*) Finally, the 35% contingency fee that the parties negotiated before commencing this lawsuit is "within the range of reasonableness" and therefore does not raise concerns. *Hammonds*, 2020 WL 5517496, at *2; *Salas*, 2023 WL 8832422, at *2 (approving a 40% contingency fee agreement when ruling on a proposed settlement).

**D. The Remaining Distribution**

Finally, the Court finds no issues with the rest of the proposed distribution of the settlement proceeds. Outside of attorneys' fees and costs, one health insurance lien of $212,563.86 was placed on the proceeds. (Doc. No. 76 at 6, 24.) Plaintiff's fee agreement with counsel made clear that such costs would be paid from any judgment or settlement that she would receive. (*Id.* at 39 ("I understand all medical bills not paid by insurance are my responsibility unless otherwise noted on an applicable Schedule of Distribution.").)

After the deduction of this lien, and the various attorneys' fees and costs discussed above, Plaintiff proposes to distribute 33.33% of the remaining balance to the survival claim and 67.67% to the wrongful death action. (*Id.* at 6.) Plaintiff proposes to evenly split the wrongful death apportionment between Decedent's parents. (*Id.*) Given that the Decedent had no children and these two individuals are the Decedent's only close family members of which the Court is aware, such a distribution of wrongful death proceeds is fair and reasonable.

## III. Conclusion

In sum, the Court finds that Plaintiff's proposed settlement and apportionment of settlement funds is adequate, fair, and reasonable under the circumstances. An appropriate order follows.